**In re Garry Lenn BLOCK, Debtor.**

**Garry Lenn Block, Plaintiff,**

**v.**

**U.S. Department Of Education, Defendant.**

**Bankruptcy No. 01–43588–JWV.**
**Adversary No. 01–04152–JWV.**

United States Bankruptcy Court,
W.D. Missouri,
Western Division.

Feb. 13, 2002.

Judith M. Strong, Kansas City, MO, for Defendant.

Gary W. Smith, Sedalia, MO, for Plaintiff.

## MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

This Adversary Proceeding is before the Court on a Complaint to Determine Dischargeability filed on September 20, 2001, by the Debtor, Garry Lenn Block, seeking a discharge of a consolidated student loan debt under 11 U.S.C. § 523(a)(8) on the basis of undue hardship. The Court held a hearing on January 9, 2002, and at that time took the matter under advisement. Upon consideration of the evidence and relevant case law the Court is now ready to rule.

For the reasons stated herein, the Court finds that requiring the repayment of $120,591.00 in consolidated student loans to the United States Department of Education—or at least some portion thereof as required under the Department of Education's income-sensitive repayment plans—does not constitute an undue hardship on the Debtor as defined by present law. Therefore, the Court has determined that the student loan debt is not dischargeable under 11 U.S.C. § 523(a)(8).

This Court has jurisdiction of this Adversary Proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This Memorandum Opinion and Order constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTUAL BACKGROUND

The evidence in this case is largely uncontroverted, although the Debtor objected to the relevance of many of the voluminous exhibits offered by the Defendant.[1] The Debtor, Garry Lenn Block ("Garry" or "Debtor") filed his petition for Chapter 7 bankruptcy on July 24, 2001. The student loan debt is a consolidated loan guaranteed by the United States Department of Education ("DOE") in the amount of $120,591.00. This amount represents the funds borrowed for Garry's educational expenses from one year after high school in 1988, when he first attended Concordia Teachers College in Seward, Nebraska, until he finished his masters degree in December 1998. In fact, Garry has successfully completed three degrees: a Bachelor of Arts degree with double major in Mathematics and Biology conferred in May 1993, a Bachelor of Science degree in Secondary Education conferred in May 1994, and a Master of Science Degree in Mathematics conferred in December 1998. He has attended Concordia Teachers College; University of Kansas, Lawrence, Kansas; Johnson County Community College, Johnson County, Kansas; University of Nebraska, Lincoln, Nebraska; and Texas Tech University, Lubbock, Texas, where he received his masters degree. In

---

1. Counsel for the Department of Education offered more than 200 exhibits that filled more than nine bound volumes. Most of the documents dealt with the Debtor's past financial history and transactions and therefore were not relevant to a determination of whether the Debtor would be able in the future to pay his student loan debt. Having said that, there were some documents that did clarify or corroborate testimony that was received at trial. The Court has considered only those documents relevant to a proper ruling in this case.

addition to the degrees mentioned, he has at various times held teaching certificates in Nebraska and Kansas, but those have expired. He received some training in Emergency Medical Training, hazardous waste operations and emergency response and has a certificate of completion from Nortel Networks in Call Center Server Release 3.0 Client Administration and Management. While attending school he worked at various jobs, such as maintenance man and painter, teaching assistant, substitute teacher, adjunct instructor, lumber yard puller and delivery assistant, and park ranger. At the time of his bankruptcy filing, Garry was teaching a summer mathematics course at Missouri Valley College in Marshall, Missouri, and was working part-time as a Park Ranger for the City of Marshall. Currently, Garry is an Assistant Professor of Mathematics at Missouri Valley College. He started this position in August 2001 and his current salary is $31,000 per year.

The Debtor testified that he has attempted to maximize his income while minimizing his expenses. In his effort to maximize his income the Debtor moved to Kansas City to take a job with Sprint in July 2000 making approximately $39,000 per year; however, this effort ended nine months later when he voluntarily quit the job because he was unable to sell his home in Marshall. He testified that it was difficult to catch up on his debts when he had to keep paying his mortgage in Marshall and for an apartment near Kansas City. On March 8, 2001, he moved back to Marshall, where he currently resides in a home he purchased in June 1999.

Since the filing of his bankruptcy in July 2001, Garry has continued to have financial difficulties, including replacing the furnace in his home and making major repairs on his automobile. He testified that in order to meet these unexpected expenses he borrowed $5,000.00 from his parents. He also testified that he had borrowed from his parents the money needed for attorneys' fees in this bankruptcy, which total $1,300.00. He has budgeted $300.00 per month to repay them and has already made two payments.

Garry testified that the following reflects his current monthly budget:

| INCOME | $1,827.00 |
|---|---|

| EXPENSES | |
|---|---|
| Mortgage | $400.00 |
| Real Estate Taxes | 55.00 |
| Property Insurance | 34.00 |
| Home Maintenance | 40.00 |
| Electric | 125.00 |
| Gas | 140.00 |
| Telephone | 100.00 |
| Cable | 21.00 |
| Food & household | 200.00 |
| Clothing | 50.00 |
| Medical & Dental | 85.00 |
| Transportation | 200.00 |
| Recreation & Entertainment | 75.00 |
| Newspaper & Magazine | 11.00 |
| Charitable Contributions | 250.00 |
| Laundry/Dry Cleaning | 40.00 |
| Barber/Beauty Shop | 20.00 |
| School & Educational Exp. | 150.00 |
| Auto Insurance | 20.00 |
| Taxes | 15.00 |
| YMCA | 20.00 |
| 2000 Kansas taxes | 30.00 |
| 2000 Federal taxes | 40.00 |
| Furnace, car (to parents) | 300.00 |
| | |
| TOTAL | $2,421.00 |

The Debtor is 32 years old, earns $31,000 per year, and is in good health. He has never been married and has no dependents, but would like to marry and have a family someday. Garry believes that it would be an undue hardship for him to repay his debt of $120,591.00 to DOE, even though he has been offered an income contingent repayment plan which would require him to pay approximately $373.00 per month for the next 25 years.

## DISCUSSION

Section 523(a)(8) of the Bankruptcy Code provides that educational or student loans are excepted from the general discharge provisions of the Bankruptcy Code "unless excepting such debt from

discharge ... will impose an undue hardship on the debtor and the debtor's dependents." 11 U.S.C. § 523(a)(8).[2] There is no dispute that the Debtor's consolidated student loan held by DOE falls within the coverage of this provision. However, Congress did not define undue hardship; therefore, it has been left to the courts to decide on a case-by-case basis what constitutes undue hardship. Three approaches have been developed to assist courts in determining whether a § 523(a)(8) discharge is warranted. *Crowley v. United States Department of Education (In re Crowley)*, 259 B.R. 361, 363 (Bankr. W.D.Mo.2001) (this Court's in-depth discussion of the three approaches). In the Eighth Circuit, the approach consistently applied is a "totality of the circumstances" test as enunciated in *Andrews v. South Dakota Student Loan Assistance Corporation (In re Andrews)*, 661 F.2d 702 (8th Cir.1981). *See Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127 (8th Cir. BAP 1999). The totality of the circumstances test established by *Andrews* requires an analysis of (1) the debtor's past, present, and reasonably reliable future financial resources, (2) calculation of the debtor's and his or her dependents' reasonable necessary living expenses, and (3) any other relevant facts and circumstances surrounding the particular bankruptcy case. *Andresen*, at 140. *See Svoboda v. Educational Credit Management Corporation (In re Svoboda)*, 264 B.R. 190 (8th Cir. BAP 2001); *Long v.*

*Educational Credit Management Corporation (In re Long)*, 271 B.R. 322 (8th Cir. BAP 2002). The debtor has the burden of proving undue hardship by a preponderance of the evidence. *McCormick v. Diversified Collection Services, Inc., (In re McCormick)*, 259 B.R. 907, 909 (8th Cir. BAP 2001).

### 1. The Debtor's Past, Present and Future Financial Resources

As demonstrated by the facts set out hereinabove, the Debtor has been out of school for three years and in this short time he has demonstrated his ability to use his degrees and skills acquired to earn a living. While the picture the Debtor paints would lead one to believe that his situation is hopeless, it is apparent from the evidence presented that indeed the Debtor has the ability to earn a decent living, using the knowledge he has obtained with the assistance of the student loans. The Debtor offers his minimal annual pay increases in his current position as Assistant Professor of Mathematics as proof of his future financial resources. Currently, the Debtor earns $31,000 per year;[3] however, the Debtor admitted that he could earn additional income by teaching in the summer at the college. Furthermore, the Debtor's prior employment history suggests that the Debtor is capable of obtaining remunerative temporary and part-time employment. If the Debtor de-

**2.** Section 523(a)(8) of the Bankruptcy code provides: (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for any obligation to repay funds received as an educational benefit, scholarship or stipend, un-

less excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents. 11 U.S.C. § 523(a)(8).

**3.** His current income is far from a poverty level. The threshold poverty level for one person is an annual income that falls below $8,667.00 per year. *See U.S. Census Bureau Statistical Abstract of the United States* 443 (2001).

sires to remain in the field of education he may have to supplement his income with part-time work in order to realize his financial goals or he may have to search for a higher paying teaching position. With his present degrees, he appears well-qualified for better, higher-paying jobs at larger educational institutions.

Some courts have held that a debtor cannot voluntarily reduce his income and then seek a discharge of his student loan debt as an undue hardship. *U.S. Dept. of Educ. v. Rose (In re Rose)*, 227 B.R. 518, 525 (W.D.Mo.1998); *Healey v. Mass. Higher Educ. (In re Healey)*, 161 B.R. 389, 394–95 (E.D.Mich.1993). Garry moved to Kansas City in July 2000 to find a higher paying position and he did find employment with Sprint earning $39,000 per year. However, he was unable to sell his home in Marshall and was forced to maintain two residences which caused further financial difficulties. The Debtor has successfully demonstrated an ability to work in areas other than education. Nevertheless, the Court finds that the Debtor has voluntarily reduced his income by returning to the field of education and is capable of making a higher salary if he desires. As further evidence of the Debtor's future potential earning power, the Court notes that his adjusted gross income in 2000 was $42,188.00.[4]

The Debtor is now a highly educated, articulate person. The Court believes that he is at the cusp of a rewarding and intellectually satisfying—if not necessarily financially lucrative—career. While Debtor may have a sincere desire to continue as a teacher at Missouri Valley College, the Court believes that he has the ability to substantially increase his current income if he chooses, while remaining in the teach-

ing profession. The Court cannot permit the Debtor to, in effect, create his own undue hardship and avoid at least partial repayment of his student loans by voluntarily choosing to remain at a smaller educational institution, earning a modest salary, regardless of how rewarding he finds the teaching there. Having two bachelors degrees and a masters degree in his possession, the Debtor has apparently unlimited opportunities to earn substantially more money in the future than he is earning now, and the Debtor has failed to convince the Court otherwise. The Court finds that the Debtor falls well short of meeting his burden to prove that he is unable to maintain a minimal standard of living for himself currently or in the future while making at least some payments on his student loan debt.

## 2. The Debtor's Necessary Reasonable Living Expenses

▆▆▆ The Court has examined the Debtor's revised Schedule J as evidence of his monthly expenses. "The bankruptcy court must determine whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living." *In re Wegfehrt*, 10 B.R. 826, 830 (Bankr.N.D.Ohio 1981). Based upon the expenses as set out above in this opinion, the Debtor apparently has a deficit of $542.00 per month. No evidence was provided to the Court to explain how the Debtor makes up this deficit each month. The Court suspects that several categories are estimates of what the Debtor would like to pay or save, but he has not actually done either. For

---

4. Most interesting is that this amount is almost double the 1999 adjusted gross income of $21,546.00, which indicates to the Court that the Debtor will, over time, be able to substantially increase his earnings.

instance, the Court questioned the Debtor about the change in charitable contribution from the original Schedule J filed at the time of petition, which listed $10.00, and the revised Schedule J, which lists $250.00. (Pl.'s Exs. 1 and 2) The Debtor explained that $250.00 is the amount he would like to be able to contribute to his church as he feels that it is his obligation to tithe. While the Court recognizes that there is a disagreement among courts as to whether the Religious Liberty and Charitable Donation Protection Act of 1998, Pub.L. No. 105–183, 112 Stat. 517 (June 19, 1998) applies to 11 U.S.C. § 523(a)(8),[5] in this case the truth of the matter is that the Debtor does not currently contribute $250.00 of his income to his church. His testimony is that he merely wishes that he could. Therefore, for purposes of this analysis, the Debtor's charitable contributions will be reduced to $10.00, thereby reducing his budget deficit by $240.00.

■ Similarly, the Debtor lists a monthly item of $150.00 for educational expenses that are not actually being incurred. The Debtor testified that he would like to set aside $150.00 a month to help pay his expenses to attend the University of Missouri in Columbia in order to pursue his Ph. D. in Mathematics, although this advanced degree would not increase his income in his present position at Missouri Valley College. In response to questions by the Court, the Debtor said he was prepared to drive the 65 miles each way to Columbia to obtain his doctoral degree, but he would be unwilling to pursue employment with the University after obtaining his Ph.D. to increase his future earnings.[6] The Court finds this item an unnecessary living expense and will subtract $150.00 from the expenses listed.

■ The next questionable item in the monthly budget is a $300.00 payment to the Debtor's parents. The Debtor borrowed $5,000.00 from his parents post-petition to replace his furnace and repair his 1990 automobile. Apparently, the Debtor also borrowed $1,300.00 for his attorneys' fees in these bankruptcy proceedings. This brings the total due to the parents to approximately $6,300.00. The Debtor has made two payments to his parents—bringing his current obligation to $5,700.00 (the Debtor did not testify as to whether his parents are charging him interest). The Court agrees with the Debtor that he does have an obligation to repay his parents; however, this $300.00 must be excluded from the monthly budget, or at least reduced, as it is not a necessary expense needed to maintain a minimal standard of living.

■ The Court now turns to the reasonableness of the Debtor's actual living expenses. In the category of transportation the Debtor listed $200.00. This amount seems excessive given the fact that the Debtor has no car payment and lives and

---

5. Compare *In re Lebovits,* 223 B.R. 265 (Bankr.E.D.N.Y.1998) (court found that the amendment is applicable under 523(a)(8), with *Educational Credit Management Corp. v. McLeroy (In re McLeroy),* 250 B.R. 872 (N.D.Tx.2000)) (court finds that RLCDPA's provisions do not apply to 11 U.S.C. 523(a)(8)), and *Ritchie v. Northwest Education Loan Assn. (In re Ritchie),* 254 B.R. 913 (Bankr.D.Idaho 2000)(religious tithing excluded from expenses in undue hardship analysis).

6. The Debtor guessed that a professor of mathematics at the University of Missouri—a state supported university with an enrollment many times that of Missouri Valley College—could earn about $65,000.00 a year, but quickly added that such a professor would be expected to do research and publish articles. The Debtor said he instead prefers teaching at the smaller institution.

works in a relatively small town. This amount should be reduced by at least one-half. The Court has also examined the telephone expenses and believes that $100.00 per month is excessive. With the present offerings being made by many cellular telephone companies, this expense could be reduced by at least one-half. The Court also believes the medical and dental category ($85.00 a month) is excessive. The Debtor has health and dental insurance premiums deducted from his paycheck each month, so most major expenses should be covered. The Court notes that the Debtor wears eyeglasses, but there was no testimony given that he was currently in need of medications. In fact, the Debtor could not recall what coverage his health insurance provided. This indicates to the Court that the Debtor has not used his health insurance and more likely than not does not have any significant medical expenses not covered by health or dental insurance. Therefore, the amount listed for medical and dental expenses of $85.00 appears unreasonable. The Court would consider $45.00 a month more than reasonable under these circumstances.

The final expense that seems excessive to the Court is the aggregate of all housing expenses.[7] The Debtor owns a home—an older home at that—which causes the Court to question why he doesn't try to find more economical housing. Although the Debtor testified that he has attempted to find an apartment without success, the Court encourages the Debtor to try again. While owning a home is a major part of the American dream and is usually a way to build equity, it should not come at the expense of the Debtor's student loan credi-

tors (in this case, the American taxpayers). While there is no bright line test for determining an appropriate amount for housing, the Court would note that the Debtor in *Crowley* paid just $386.00 a month for rent and utilities, versus the $794.00 a month the Debtor pays. *See Crowley* at 364. Surely, the Debtor could obtain adequate housing in Marshall for a maximum of $594.00 a month, a reduction of $200.00 a month in aggregate housing costs.

For the foregoing reasons, the Court finds that the expenses listed on the Debtor's Revised Schedule J should be reduced by the following amounts: $150.00 education, $240.00 charitable contribution, $300.00 payment to parents, $100.00 transportation, $50.00 telephone, $40.00 medical and dental, and $200.00 housing. The total of these reductions is $1,080.00. In summary, then, the Debtor has a net income of $1,827.00 a month—which could easily be increased with summer teaching assignments at the college—and monthly expenses of $1,341.00, which will net the Debtor a disposable income of $486.00 a month.

### 3. Other Unique Circumstances

The third factor of the *Andrews* test provides for consideration of other relevant factors and circumstances that are present in a case. The Debtor has presented no unique or special issues in this case for the Court to consider.[8]

In summary, the Court finds that the Debtor is a single, healthy young man with no dependents, who will not be subjected to any undue hardship if his student loan is not discharged in this bankruptcy. To find otherwise would be to offend the poli-

---

7. If the Court's arithmetic is correct, the total of the mortgage, real estate taxes, property insurance, electric and gas equals $794.00 a month.

8. Unique circumstances for purposes of determining undue hardship include physical or mental disability of the debtor or other dire circumstances that are beyond the control of the debtor. *See e.g. Andrews* and *Andresen.*

cy behind making such educational loans nondischargeable.[9] The Debtor has the skills and abilities to make some substantial payment on his student loan debt over the next 25 years. Since the Debtor has failed to meet his burden of proof, the Court finds his student loan debt to DOE in the amount of $120,591.00 nondischargeable.

At the same time, the Court recognizes that it is very likely that the Debtor will never be able to repay the student loan debts entirely. Repaying a $120,000.00 loan over 25 years, even at a modest 7 percent interest rate, would require monthly payments of almost $850.00. Also, the Court is not unsympathetic to the Debtor's belief that his parents should be paid what they are owed. Accordingly, the Court would encourage the DOE to place the Debtor in an income-sensitive repayment plan with a monthly payment of not more than $250.00–300.00 for the first three years, and thereafter increasing to the monthly payment that the plan provides, based on the Debtor's income. This would enable the Debtor to make a monthly payment to his parents of at least $150.00 and perhaps more when he makes the necessary reductions in his living expenses.

Therefore, it is

**ORDERED** that the Debtor's Complaint to Determine Dischargeability pursuant to 11 U.S.C. § 523(a)(8) be and is hereby DENIED. It is

**FURTHER ORDERED** that the United States Department of Education consider placing the Debtor in an income-sensitive repayment plan with a monthly payment of not more than $250.00–300.00 for the first three years, and thereafter

increasing to the monthly payment that the plan provides, based on the Debtor's income.

---

9. Congress has intentionally excepted student loans from discharge because some graduates filed bankruptcy on the eve of a lucrative career in order to escape the obligation of their student loans. *Andresen* at 130.